## Case No. 14,585.

### UNITED STATES v. BERREYESA.

District Court, D. California.[1]

SPANISH GRANT—PAROL EVIDENCE—PUEBLO LANDS
—POSSESSION BY PERMISSION—EFFECT—
EQUITABLE CLAIMS.

[1. Oral testimony is not admissible to establish the making and contents of a Spanish grant, of the issue of which the archives contain no trace.]

[2. The ayuntamiento of a pueblo had no power to grant lands, within the limits of proprios duly and formally assigned to the pueblo. so as to create a greater estate in them than a lease hold for five years.]

[3. Evidence that in 1837 an expediente was formed in the matter of an application for land in the possession of the applicant, and that the application was favorably reported on by the ayuntamiento, does not show that any grant was actually made.]

[4. Possession of lands in a pueblo, under a concession by an officer having authority only to lease for five years, accompanied by efforts on the part of the occupant to obtain a grant, was not "under claim of ownership."]

[5. The facts that one in possession of land applied for a title thereto, and that his application was approved by the governor, did not affect the character of his possession. so as to render it that of a Mexican colonist with the permission of the government.]

[6. The facts that one obtaining from the ayuntamiento a loan of certain pueblo land, with the expectation of settling on it, and obtaining a grant from the governor. occupied and cultivated it. and that his possessory rights were respected by his neighbors and some of the authorities. impose no obligation upon the United States to allow his claim to the land; the Mexican government having failed. from 1834 to its overthrow, to act favorably on his application for a grant.]

[This was a claim by Nicolas Berreyesa for the rancho called "Milpitas."]

OPINION OF THE COURT. Since the former opinion was filed, the case has been reopened for further proofs and argument, voluminous depositions have been taken, and its whole merits discussed with great ability and zeal. The claimant has not succeeded in materially changing its aspect, so far as relates to the proof of a grant to Berreyesa. A document alleged to come from the archives, and purporting to be a copy of a

[1] [Not previously reported.   Date not given.]

grant, was offered in evidence; but the proofs of its authenticity were so unsatisfactory, and its appearance was so suspicious, that it was abandoned at the hearing by the counsel for the claimants, with the expression of the hope that its introduction would not unduly prejudice the case of the claimant. A very long and elaborate deposition by Mr. Hopkins, the well-known keeper of the archives. was also taken. In this deposition, Mr. Hopkins mentions a considerable number of expedientes, of unquestionable authenticity, which were not found in the archives, but were produced from private custody. To this the counsel of the United States, while admitting the fact, replies that in each of those instances either the expediente itself, or the circumstances of the case, satisfactorily explain how it happened that the expediente was not in the archives. But the inquiry appears to me wholly immaterial. The question in this case is not what degree of suspicion should attach to an expediente from the mere fact that it is produced from private custody, but whether the court can accept oral testimony to establish the making and contents of a grant, where the archives contain no trace whatever of its having been issued. Under the decisions of the supreme court, such testimony must be rejected. The case before us is even stronger. For not only is no proof of the alleged grant found in the archives, but the grant itself. which should have been delivered to the grantee, is not produced. Berreyesa himself merely states that "he has reason to believe" the grant issued. His exertions to find it, and his disappointment at not succeeding, seem to indicate that this belief was sincere; but he does not pretend to have ever had the grant in his possession, for in that case he would have known that it issued. Still less does he attempt to prove its loss or destruction, or to give any satisfactory evidence of its contents. It is evident, therefore, that the claimant has wholly failed to establish by competent, or even morally convincing, proofs. that he ever obtained a grant for the land in question. An effort was made on the part of the United States to show that the boundaries of the land of which the claimant was in possession were vague and undefined, and that the possession itself was disputed, and not evidenced by the exercise of clear, notorious. and exclusive acts. I consider it unnecessary to review the testimony on these points. It is established, in my judgment, beyond controversy, that the tract of land upon which Berreyesa, by the permission of the ayuntamiento, established himself, had defined and recognized limits,—quite as much so as in a large majority of cases where grants were made by the former government. It is bounded on three sides by the hills and two arroyos or brooks, and. though there may be some room for discussion as to the precise location of a portion of the west-

ern line, the uncertainty is no greater than exists in the descriptions found in almost all the Mexican grants, or than would probably have existed in the grant for this land, had Berreyesa succeeded in obtaining one.

Before referring to the various acts relied on by the claimants as recognitions of the rights of Berreyesa, let us first ascertain what those rights were, and in what proceedings they had their origin. On the 15th of April, 1834, Berreyesa presented a petition to the constitutional alcalde of San José, in which, after setting forth his claims by reason of his numerous family, and considerable property, he solicits the place called "Milpitas," in order permanently to establish himself, and place it all in his possession ("para radicarme y poner en el toda mi finca"). On the 6th of May of the same year the ayuntamiento, by an order in the margin of Berreyesa's petition, concedes to him the place he solicits on the same terms as other concessions in the "proprios of these demarcations" (or limits of the pueblo). As to the "terms" on which this concession was made, no evidence is offered; but some light may be thrown upon the matter from the account of the proceedings of the ayuntamiento of Monterey with reference to a somewhat similar application. On the 5th of December, 1836, one Espinosa petitioned that ayuntamiento for a solar (town lot) within the "egidos" (suburbs) of the pueblo. The ayuntamiento, being in doubt whether the power to grant lay with them, or with the political chief, referred the matter to him for decision. The governor ordered the communication to be transmitted to the assessor attorney general of the territory, for his report. In his "consulta," or opinion, the assessor advises the governor that his power to grant applied to such lands, only, as did not belong to any private individuals or corporation, and that as the egidos, as well as lands belonging to the "fundo legal," are the absolute property of the ayuntamiento, it was "clear that, where such lands are in question, there should be no intervention on the part of the political chiefs." The assessor further observes that, by the laws of the Novissima Recopilacion, and by a royal resolution, which he cites, the power of the ayuntamiento over the lands referred to is limited to leasing them for five years. The political chief, in transmitting this "consulta" to the ayuntamiento, takes occasion to define with precision the meaning of the various terms applied to pueblo lands, and the rights of the municipality with regard to them. By "termino jurisdicional" "is understood, all lands comprised within the limits to which the jurisdiction of the alcalde or judge of the pueblo extends." "Termino municipal" is the land assigned to the pueblo for the use of its inhabitants, within which neither the cattle nor inhabitants of adjoining pueblos can enter either for grazing or cutting wood. The "terrenos de pro-

prios" are lands assigned to ayuntamientos which may be leased by them for a term not exceeding five years to defray their expenses. The remaining ungranted lands, after the assignment of proprios, are at the disposal of the government; but upon lands granted within the limits of the termino municipal a censo or tax may be imposed. "Egidos" are lands immediate to, and in the circumference of, the pueblo, reserved for the use of the inhabitants, a quarter or half a league in width, to form walks and alleys, and to secure ventilation. These lands the ayuntamiento may dispose of for building lots. These instructions of the governor, and the consulta of the assessor, appear to have been accepted as correct by the ayuntamiento. It thus appears that the power of the ayuntamiento, to dispose of lands, was confined to granting building lots within the narrow strip of suburbs reserved as "egidos," and to leasing for the term of five years the lands within the "proprios." Assuming, then, that the lands conceded to Berreyesa were within the limits of proprios which had been duly and formally assigned to the pueblo, the ayuntamiento had no right to grant them, or create any greater estate in them than a leasehold for five years. It may therefore be conjectured that the "terms" referred to in the marginal order of the alcalde were the liability to a censo, or tax, in case the lands, being within the termino municipal, should afterwards be granted.

In the archives of San José, under date of June 18th, 1837, is found a minute or borrador of a report made by the ayuntamiento of San José, evidently in reply to an order for information sent there by the governor. This report is as follows: "In reference to the superior decree which precedes this, a long time ago the ayuntamiento reported that the party mentioned therein had the necessary prerequisites, as a native of the country, to obtain a rancho. He has been in possession for some time past of the land which he solicits, in the quality of a loan which the illustrious ayuntamiento of that year graciously made him. It may be granted to him in full property, without prejudice, and subjecting him to pay the municipal tax which is due to the limits of a town, in case it should reach there." This record, which is regarded by Mr. Hopkins as of unquestionable authenticity, may be accepted as proof that in June, 1837, an expediente had been formed in the matter of the application of Berreyesa for a grant; that his petition had been referred by the governor to the ayuntamiento, and a favorable report made by them. It also proves that a similar report had been made by them "a long time" before, in all probability, on a similar order of reference. The testimony of Anto. Maria Pico, to the effect that, some two years after Berreyesa entered upon the land, an expediente, with a map attached, was referred to him, and that he reported that it might be

granted to Berreyesa, is thus corroborated. Here all record evidence of the formation of an expediente ends. If Alvarado is to be believed, a grant was made by him in 1842; and Victor Castro testifies that he saw the papers, with Alvarado's name attached, at Monterey in 1841. For the reasons assigned in this and a former opinion, this testimony must be rejected as evidence that a grant was made, but it may be accepted as an admission by the claimant that up to 1842, at least, his possession had continued under the original concession of the alcalde, and that his efforts to obtain a grant had been abortive.

It is strenuously urged by the counsel for the claimant that from the date of his concession, up to the time when he was ousted by American intruders, Berreyesa's possession was "notorious, exclusive, uninterrupted, and under claim of ownership." That it was notorious is unquestionable. That it was uninterrupted and exclusive may also be admitted, but I see not how it can be asserted to be "under claim of ownership," when it was held under a concession from an authority which had no power to grant, and when we find him, by his own admission, endeavoring in vain, during eight years, to obtain a title. The causes of his failure it is impossible now to conjecture. He had obtained two favorable reports from the ayuntamiento, and from the alcalde, Antonio Maria Pico, as early as 1835, and yet it is not pretended that he received a title before 1842. It is a singular circumstance that, of the four persons in whose favor the ayuntamiento reported in 1837, no one appears to have obtained a grant founded on those reports. Grants were subsequently obtained by all but Berreyesa, but they were based on other proceedings, and the expedientes contain no mention of, or reference to, the reports of the ayuntamiento of 1837. Berreyesa's want of success, therefore, was shared by his companions; but he has had, as he alleges, the additional and peculiar ill fortune to have subsequently obtained from Alvarado a grant, for which the expediente has disappeared, of which no mention or trace is found in the archives, and the title paper of which was lost or destroyed before it reached his hands. That Berreyesa's possessory rights were generally recognized and respected is abundantly proved. He was cited to appear as a colindante when juridical possession of an adjoining rancho was to be given. The investigations respecting a murder are officially stated to have taken place "at the rancho of Berreyesa." In the map of San José, the tract of Milpitas is laid down, and a house marked as the "house of Berreyesa" is represented. In these and other ways his possessory rights were respected and recognized, and we know enough of the customs of the former inhabitants of the country to require little proof to show that the rights of a person who had obtained from an ayuntamiento permission to occupy a tract of pueblo land, and who had entered and built upon and was in the actual occupation of it, with his herds, would be respected by his neighbors. It is ingeniously urged by the counsel for the claimant that from the time when Berreyesa applied for a title, and on the order of reference by the governor, favorable reports were made, he must be considered as in possession of the land as a Mexican colonist (i. e. under the colonization laws), with the knowledge and permission of the government, and as no longer holding by virtue of the concession or loan by the ayuntamiento. But I am unable to perceive how the facts that he applied for a grant, and that his application was approved by the ayuntamiento, can alter the character of the possession he had theretofore held. No permission on the part of the governor to hold as a colonist is shown. No expediente exists to disclose the governor's action with regard to the application. All we know is that the petition was referred to the ayuntamiento, and a favorable report made by them, but that no grant was issued. It might be inferred that it was refused; certainly, the petition was not acted on by the governor. I see nothing in this refusal, or at least neglect, to act, on the part of the governor, which can affect the character of the possession held by Berreyesa.

The depositions in this case are very voluminous. I have not thought it necessary to enter upon a minute and critical review of them; for, in my judgment, the decision of the cause must depend upon a few facts, concerning which there is little room for controversy. It is unquestionable that in 1834 Berreyesa obtained from the alcalde a concession or loan of the place called "Milpitas," with the intention of permanently establishing himself upon it. He undoubtedly intended and expected to obtain from the governor a grant. It is probable that the ayuntamiento made the concession under a similar expectation. It is certain that they offered no opposition to Berreyesa's repeated applications for a grant. But neither they nor Berreyesa could have supposed that the concession conferred any proprietary rights. Under this concession, Berreyesa went upon the land with his horses and cattle. He built a house, cultivated a portion of it, and fully complied with all the conditions of occupation and cultivation usually imposed on grantees in colonization. In 1835, one year after his entry, he applied for a grant. He failed to obtain it; in 1837 he renewed his application, with a like result; and it is conceded that during eight years from the time of his first occupation (i. e. up to 1842) he had in vain solicited a grant. It is alleged that in 1842 he obtained a grant. But no reliable evidence of the facts is offered. The grant is not produced. Berreyesa himself does not pretend, in his affidavit, that it

ever was in his possession. No expediente is found in the archives, nor do these records contain a document or a line to indicate that a grant was ever made, save only the sheet "No. 2,008," which is abandoned as a fraudulent interpolation. It must therefore be taken as a fact that no grant was issued to Berreyesa by the Mexican government.

The question thus arises,—and it is the only one in the case,—is this government bound, in equity, to do what the former government, though repeatedly solicited, declined or omitted to do? It is strenuously urged that the ancient occupation and cultivation of the land by Berreyesa, and the recognition of his rights by his neighbors and some of the Mexican authorities, create an equity which the United States are bound to respect. That his possessory rights were respected, cannot be doubted. And the land was popularly regarded and spoken of as his, under the belief that he had obtained, or would obtain, a title, and from a knowledge of the fact that on such an application his occupation and cultivation would entitle him to a preference. But all these considerations could have been urged with far greater force upon the former government. And yet we find that during certainly eight years, and, as I am bound to conclude, up to the period of its overthrow, the government declined or neglected to issue the title. The equities of Berreyesa must therefore be considered as having been presented to the former government, and as having been by it ignored or rejected. In the former opinion in this case the decisions of the supreme court in analogous cases were noticed, and it was shown that in none have equities such as those relied on in this case been recognized. The position taken by the counsel for claimant, in his belief that the government, on receiving the favorable report of the ayuntamiento, was bound by law to make the grant, is novel and untenable. The law confided the exercise of the granting power to the governor's discretion. That discretion he might use arbitrarily or unjustly, but the power lay with him. What motives induced the governors, for so long a time, to withhold a grant from a person apparently so meritorious as Berreyesa, we cannot now ascertain. But, in the absence of any expediente, we have no right to assume that there could have been before the governors no unfavorable reports whatever, and no considerations urged upon them which induced the withholding of the grant. If Berreyesa had gone upon the land by the governor's authority, or with his sanction and permission, and under a tacit promise of the title, it might be urged that the governor was bound to make the grant. Such was Alvisu's case. But his only authority to enter on the land, was derived from the ayuntamiento. His entry was without the sanction, authority, or probably the knowledge, of the granting power. Serrano v. U. S., 5 Wall. [72 U. S.] 461.

In the views I take of the case, it is unnecessary to do more than allude to the fact that in 1853 Berreyesa and his sons preempted a portion of the lands now claimed, and, under oath, affirmed that the same were vacant and "not claimed under any existing title." They subsequently obtained deeds from the town of San José for their respective tracts. Their example was followed by others, and the lands in controversy are now occupied by some 30 or 40 families, who have cultivated and improved them. They are said to be of the value of $120,000 to $125,000. The petition in this case was not presented to the board until the day preceding the expiration of the time allowed by law for the purpose, and it is said that neither Berreyesa nor his family has any interest in the controversy. The circumstance that Berreyesa has in so formal a manner disclaimed title, and thus probably induced others to settle and spend money on the land, may not, perhaps, estop the claimant to set up in this proceeding whatever title he in fact had. For he may have acted ignorantly, or under interested advice. But this, with the other circumstances referred to, cannot be left out of consideration, in determining what are the equitable obligations and duties of the United States towards Berreyesa, or others who have acquired his rights.

My opinion is that the claim should be rejected.